UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Cause No. 1:19-CR-35 |
| | ) | |
| ADAM T. MEEKIN | ) | |

**GOVERNMENT'S SENTENCING BRIEF**

Comes now the United States of America, by its counsel, Clifford D. Johnson, United States Attorney for the Northern District of Indiana, through Anthony W. Geller, Assistant United States Attorney, and files this Government's Sentencing Brief. After the filing of the presentence report (PSR) in docket entry 76, the government objected to the lack of a trafficking enhancement, and the Court held an evidentiary hearing on August 11, 2022. After developing evidence at the hearing, Defendant Adam Meekin's guidelines range should be enhanced *both* for firearms trafficking pursuant to U.S.S.G. §2K2.1(b)(5) and for transferring a firearm with reason to believe that it would be used or possessed in connection with another felony offense pursuant to U.S.S.G. § 2K2.1(b)(6)(B).

Meekin pleaded guilty to engaging in the business of dealing and manufacturing firearms, in violation of 18 U.S.C. § 922(a)(1)(A), and to the

1

unlawful possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5841(d) and 5861(d). In the plea agreement, he and the government agreed that his offense involved between 100 and 199 firearms. (PSR, ¶ 5) Meekin sold firearms indiscriminately to his customers, continued to sell firearms despite these guns being seized in violent crimes in three states, and catered clandestinely to a clientele possessing illegal and unregistered firearms in violation of the National Firearms Act (NFA).

*Factual Background*

In 2018, Meekin caught the attention of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) after investigators noticed him advertising firearms for sale on social media. (PSR, ¶ 14) ATF performed database checks and discovered that 11 separate crime guns were traced to purchases of lower receivers conducted by a Meekin family member. (PSR, ¶ 12; Tr. 53-56) Police officers in Detroit, Chicago, and Fort Wayne seized these guns in 2017 and 2018 in homicides, attempted homicides, robberies,[1] and other criminal activity by gang members. (PSR, ¶ 12; Tr. 57, 77-79) All of the guns were completed AR-15 style rifles with Anderson Manufacturing lower receivers, which is the part with the trigger assembly that accepts the upper receiver with the barrel. (PSR, ¶ 12) In total, Meekin's family members completed ATF

---

[1] The robberies involved a string of convenience store robberies committed primarily by Brendan Collicot, which was charged federally in this Court. (Tr. 57, 84)

forms 4473 and purchased at least 122 lower receivers on behalf of Meekin. (PSR, ¶ 13, 21)

ATF undercovers performed a series of controlled operations with Meekin, buying completed firearms and ordering a highly illegal NFA firearm. On June 21, 2018, an ATF undercover agent (UC) purchased a fully assembled Anderson Manufacturing AM-15 rifle from Meekin. (PSR, ¶ 15) On July 11, 2018, the UC purchased parts for converting his rifle into a machinegun, with Meekin selling these full-auto parts kits but not listing them on his website. (PSR, ¶ 16; Tr. 19) On August 2, 2018, an undercover task force officer (UC TFO) brought a lower receiver to Meekin, and Meekin assembled and sold him a completed rifle. (PSR, ¶ 17) On August 8, 2018, the UC TFO purchased firearms parts and another completed rifle. (PSR, ¶ 19) On November 9, 2018, the UC obtained an NFA price sheet from Meekin's anonymous email and ordered a fully automatic, short-barreled rifle, with no serial number. (PSR, ¶ 22) Any non-military or non-police machinegun manufactured or converted after 1986 is illegal and cannot even be registered under the NFA. (Tr. 15-16) Although the undercovers provided little personal background, Meekin performed no records checks, never asked for identification, and provided no sales paperwork. (Tr. 20, 41, 68-69, 74-75)

During the recorded conversation on June 21, 2018, Meekin talked about being in business for two or three years and making about $5,000 per month,

3

and he told the UC, "There is nothing I can't build." (PSR, ¶ 15; Tr. 9, 13-14) Meekin discussed his "ghost gunner machine" that he would temporarily "sell" to customers for a dollar, with this expensive machine ($4,000 to $4,500) allowing the customer to convert an almost-complete (or 80%) lower receiver into a fully completed lower receiver. (Tr. 16-18) It was called a "ghost gunner" because it allowed for the completion of unserialized lower receivers, with an untraceable "ghost gun" being a homemade firearm without a serial number. (Tr. 16-17) Meekin also told the UC about being contacted by a Fort Wayne Police Department detective about one of his guns being recovered in a homicide or attempted homicide, with Meekin refusing to be interviewed. (Tr. 18-19)

During the deal on July 11, 2018, the UC discussed how he wanted a machinegun, and Meekin explained that the UC would have to order this through an anonymous email to be provided by Meekin after the meeting. (PSR, ¶ 16) Meekin did not want to show the UC any actual machineguns because he was concerned about getting caught by law enforcement, but Meekin explained the conversion process and his great familiarity with it, stating that he had done it so much that he could drill the hole on sight without even using a jig. (Tr. 21-22) Meekin explained the clandestine procedure involving placement of the machinegun order by email, directions for a covert money delivery, and then coordinates for where to collect the assembled

4

firearm. (PSR, ¶ 16; Tr. 22-23) Meekin also explained how best to remove a serial number from a firearm, with a die grinder being his preferred tool for completely obliterating a serial number. (Tr. 28)

On July 25, 2018, in the midst of the undercover deals, Meekin sent a written message to whom he believed to be the UC, with ATF Special Agent Thomas Kaiser receiving this message. (Tr. 61) In the message, Meekin explained why he was concerned about guns potentially being traced to him via serial numbers: "liability thing, if I purchase it, it's in my name. If you go out and do something with it, it comes back to me, and then I have to deal with the mess. So I always tell clients bring your own lower if you want it assembled." (Tr. 61)

On August 2, 2018, the UC TFO brought Meekin an Anderson Manufacturing lower receiver, just as Meekin had asked. (PSR, ¶ 17) As Meekin was assembling the firearm, the UC TFO observed in the shop multiple lower receivers and a completed AR rifle with a silencer. (PSR, ¶ 17) Meekin discussed shooting coyotes and foxes with a suppressor so as not to bother his neighbors at night, but when asked, Meekin said that he used a rifle other than the one with the silencer presently in his shop, which was dropped off by a customer for some work. (PSR, ¶ 18; Tr. 64) When the UC TFO tried to look closer at this rifle, Meekin grabbed it and placed it out of view. (PSR, ¶ 18; Tr. 64-65) The UC TFO also observed two other silencers in a drawer. (Tr. 65)

Meekin discussed his attitude about the NFA registration process, dismissing it as a bunch of "bullshit" that nobody does. (Tr. 65-66) Meekin also discussed the possibility of engraving a fake serial number on a firearm, with a fake serial number being less conspicuous to law enforcement than a complete lack of a serial number. (Tr. 66) Meekin mistakenly assembled the firearm sold to the UC TFO with a different lower receiver than the one brought by the UC TFO. (PSR, ¶ 17)

During the deal on August 8, 2018, Meekin wanted the UC TFO to provide the firearm back from the prior deal, acknowledging that he assembled the firearm with the wrong receiver which could be traced back to him. (Tr. 67) Similar to the discussion with the UC, Meekin explained the anonymous email procedure to the UC TFO, confirming that Meekin knew people who had safely gotten their firearms from it. (Tr. 68) Meekin analogized the clandestine process to that of a drug dealer. (Tr. 68-69)

During the early November meeting, Meekin provided the new anonymous email address for the UC to order an NFA firearm through Meekin's surreptitious dead drop procedure. (PSR, ¶ 22) According to Meekin, the anonymous email account was changed every 30 days, with the procedure mirroring the tactics of a sophisticated drug dealer. (Tr. 24-25) Meekin further talked about his expertise with these covert tactics, mentioning that he was writing a book about how to hide firearms, launder money, structure financial

6

transactions, and so on. (Tr. 29) According to Meekin, he purchased a machinegun and a sawed-off shotgun from the son of a deceased Huntington officer. (Tr. 29) Via the anonymous email account, the UC received a price sheet with a laundry list of NFA firearms. (PSR, ¶ 22; Tr. 24) The UC emailed his order for a ghost machinegun and a suppressor for $3,000, and the UC received instructions to meet in a Glenbrook Mall bathroom for the secret money exchange. (PSR, ¶ 22; Tr. 30)

On November 19, 2018, Meekin arrived in the relevant bathroom to receive the money, and Meekin tried hard to conceal his identity as the person collecting the money, hiding in a bathroom stall and reaching for the money under the stall with a gloved hand. (PSR, ¶ 23; Tr. 31-32) Meekin was in control of the anonymous email account because the UC heard his phone chime after sending an email that the UC was at their rendezvous point. (PSR, ¶23; Tr. 31-32) ATF surveillance confirmed Meekin's identity and observed him with the envelope of cash counting the money. (PSR, ¶ 24; Tr. 32-33)

On January 2, 2019, the UC met with Meekin in part to check on his machinegun purchase. (PSR, ¶ 26-28) Meekin talked about selling $49,000 worth of merchandise over the holiday season and making $21,500. (PSR, ¶ 27) On the topic of the UC's machinegun, Meekin was still keeping his identity secret and claimed that he would "shoot them an email," utilizing a TOR internet browser for increased anonymity to avoid being caught by law

7

enforcement. (PSR, ¶ 27-28; Tr. 33-34, 59) Meekin said that multiple friends of his had utilized the same dead drop procedure and had received their firearms, with Meekin even having an opportunity to shoot these weapons. (Tr. 34-36) Meekin talked about his belief that everyone had a right to own whatever firearm they wanted. (Tr. 34) Meekin further commented that he had "made some shady shit in my day and sold it to a few friends of mine; I've made some shady shit." (PSR, ¶ 28; Tr. 35)

On April 2, 2019, the UC met again with Meekin, with the UC not receiving the machinegun. (PSR, ¶ 28-29) During this recorded conversation, Meekin talked about selling a lot of AK-47 variants lately, stating that his customers "are paying more for me to build one than they could just buy one straight up," which is consistent with criminals trying to circumvent the background check process. (PSR, ¶ 29; Tr. 36-37) Regarding the machinegun, Meekin discussed how the UC's phone number did not return to the UC's undercover name, with Meekin utilizing some sort of Internet lookup service. (PSR, ¶ 30; Tr. 37-38) Meekin was however willing to sell the UC all the parts and provide his special instruction sheet for making a machinegun and a suppressor. (PSR, ¶ 30-31) Demonstrating his familiarity with the NFA registration process, Meekin claimed that he executed an ATF form 1 to register a suppressor, which was actually false based on a subsequent records check. (PSR, ¶ 31)

On April 30, 2019, ATF served search warrants at Meekin's house and shop, locating an unregistered and unserialized silencer and an unregistered bump stock, which is classified as a machinegun. (PSR, ¶ 32) Agents located no sales paperwork or business ledgers for Meekin's firearms transactions. (Tr. 69) ATF also conducted interviews on this day, talking to the federal firearms licensee (FFL) who sold Meekin's family members AM-15 lower receivers. (PSR, ¶ 33) This person, Thomas Dempsey, confirmed the many sales to Meekin, with Meekin never completing any paperwork and always paying in cash. (PSR, ¶ 33) About a year and a half prior to the interview, Dempsey became concerned about the multiple ATF firearms traces, and he told Meekin that Meekin was selling to the "wrong people." (PSR, ¶ 33; Tr. 71) In his interview, Meekin acknowledged knowing about a few of the crime gun traces. (Tr. 70)

Meekin's Facebook records showed that he was using multiple PayPal accounts in the names of his family members for his illegal firearms transactions. (PSR, ¶ 20) Meekin's Facebook records from 2016 through 2018 demonstrated a constant flow of AR-15 variants, pistols, and "a small army of firearms" available for sale. (PSR, ¶ 14, 21) Meekin even offered discounts for buying rifles in bulk, advertising that customers could "buy 2 or more AR-15s get them at 600 each. . .buy 5 or more get them at 575 each." (PSR, ¶ 21)

Meekin possessed a laser engraver and was capable of engraving serial numbers. (Tr. 13)

*Legal Analysis*

If a defendant engaged in the trafficking of firearms, his offense level is increased by 4 levels. U.S.S.G. §2K2.1(b)(5) (2021). The commentary explains that this enhancement applies if the defendant transferred or otherwise disposed of two or more firearms to another individual and knew or had reason to believe that such conduct would result in the transfer of a firearm to an individual, whose possession or receipt of the firearm would be unlawful or who intended to use or dispose of the firearm unlawfully. U.S.S.G. §2K2.1, comment. (n. 13(A)) (2021). The phrase "individual whose possession or receipt of the firearm would be unlawful" means, in part, a person with a prior conviction for a crime of violence, a controlled substance offense, or a misdemeanor crime of domestic violence. U.S.S.G. §2K2.1, comment. (n. 13(B)) (2021). Since the undercovers did not mention having these specified convictions, the trafficking enhancement is based on Meekin selling at least two firearms to another person with reason to believe that the person or persons would use or dispose of the firearms unlawfully. The evidence demonstrates that Meekin had reason to believe that his transferees would use firearms in other crimes, including violent crimes and gang activity.

In order to demonstrate a defendant's reason to believe that his buyers would potentially use the guns in unlawful conduct, the government needs to show something more than a simple off-the-books transaction. *United States v. Moody*, 915 F.3d 425, 430-31 (7th Cir. 2019). The government bears the burden of proving the enhancement by a preponderance of the evidence. *Id.* at 429. In *Moody*, there was apparently no evidentiary hearing, and the only evidence presented on this issue was from the defendant's factual basis at his guilty plea. *Id.* at 430-31. A group stole more than 100 guns from a train car, and the defendant sold his share of 13 guns to different anonymous buyers after they had "heard about it," with the "it" not further specified as the train heist or something less nefarious. *Id.* at 427-28, 430. Of the total haul, 17 guns were recovered from crime scenes, but none of these were traceable to the guns sold by the defendant. *Id.* at 428. This limited evidence was insufficient to show that the defendant knew something more about the other buyers than being in the market for a gun. *Id.* at 430.

The Seventh Circuit nevertheless observed, "In so holding, we are mindful that our precedents allow a district court great leeway to make commonsense inferences." *Id.* at 431 (citing *United States v. Gilmore*, 60 F.3d 392, 393-94 (7th Cir. 1995), and *United States v. Jemison*, 237 F.3d 911, 918 (7th Cir. 2001)). *Gilmore* was such an example, and the Seventh Circuit there upheld a finding of the defendant's reason to believe that his buyer would use

the gun unlawfully. *Gilmore*, 60 F.3d at 394. The only evidence was that *one* of the guns transferred by Gilmore was found at a crime scene and that Gilmore did not know the identities of his buyers. *Moody*, 915 F.3d at 431 (citing *Gilmore*, 60 F.3d at 394). The *Moody* decision distinguished *Gilmore* because none of the 17 crime guns were sold personally by Moody. *Moody*, 915 F.3d at 431.

In making a commonsense inference, the Court may consider many factors beyond a simple off-the-books sale. For example, one factor showing a defendant's reason to believe his buyers would engage in illegal conduct would be the defendant's unwillingness to purchase the firearms himself and his efforts to distance his association with the guns. *United States v. Juarez*, 626 F.3d 246, 252 (5th Cir. 2010). Additional conduct favoring this inference would be the defendant's clandestine behavior, the acquisition of numerous military-style firearms, and a willingness to pay more than the retail price of the gun. *Id.* (commenting that, "It is highly unlikely that a person who intended to use these weapons lawfully would pay a $200 premium for each of them.").

In Meekin's case, there is considerable evidence of his reason to believe that his firearms sales would result in the use of these firearms in violent crimes, far beyond the sparse record in *Moody*. Out of the total 122 lower receivers purchased by family members and provided to Meekin, 11 (about 9%) were found in the hands of violent criminals and gang members in three states.

Unlike in *Moody*, these crime guns were directly traceable to Meekin's unlawful firearms business. Meekin's conduct further showed great care in distancing himself from the firearms sold by him, with Meekin utilizing family members to complete ATF paperwork, paying in cash, asking his clients to bring their own lower receiver, and counseling others on how best to obliterate a serial number. Meekin even orchestrated the clandestine dead drop procedure with NFA firearms. All of these tactics were designed to insulate Meekin from the tracing process; in other words, with full reason to believe that his firearms would end up being used in crimes, Meekin engaged in these measures to minimize the risk of a trace back to him.

As of at least June 21, 2018, Meekin told the UC directly that he was well aware of his guns being in the hands of murderers. During this buy recording, Meekin talked about being contacted by a FWPD detective, with a firearm traceable to Meekin's family being recovered in a homicide or attempted homicide in Fort Wayne. After this date, Meekin continued to sell completed firearms to the undercovers, and Meekin told the UC in April of 2019 that he was selling completed AK-47 variants to customers at a premium price over retail.

Dempsey, the FFL owner, told Meekin about the ATF firearms traces, and he cautioned Meekin about selling to the "wrong people." Based upon his estimate, this warning would have come to Meekin in roughly October of 2017,

or a year and a half prior to Dempsey's interview. Despite this warning and Meekin's knowledge of the Fort Wayne homicide investigation, Meekin continued to sell numerous firearms, all with reason to believe that his indiscriminate sales would lead to crime guns.

Based on all of this, there is significant evidence of Meekin's reason to believe that his firearms were being sold to people committing crimes with firearms. Meekin himself sold 11 total crime guns recovered in three states, he made direct and recorded admissions about a visit from a homicide detective, and he engaged in extensive efforts to disassociate himself with serial numbers and the tracing process. Meekin should therefore receive the trafficking enhancement.

A separate enhancement of 4 levels applies if the defendant possessed any firearm in connection with another felony offense or if the defendant possessed or transferred any firearm with knowledge, intent, or reason to believe that the firearm would be used or possessed in connection with another felony offense. U.S.S.G. §2K2.1(b)(6)(B) (2021). This subsection applies if the firearm facilitated or had the potential of facilitating another felony offense. U.S.S.G. §2K2.1, comment. (n. 14(A)) (2021). "Another felony offense" means any federal or state offense, other than *the* firearms possession or trafficking offense, punishable by more than a year of imprisonment, regardless of whether a criminal charge was brought or a conviction obtained. U.S.S.G.

§2K2.1, comment. (n. 14(C)) (2021). Lastly, there is no prohibition in applying both the trafficking enhancement with this enhancement so long as the other felony offense is something other than the defendant's firearms possession or trafficking. *United States v. Shelton*, 905 F.3d 1026, 1034 (7th Cir. 2018); *United States v. Rodriguez*, 884 F.3d 679, 679-80 (7th Cir. 2018); *United States v. Johns*, 732 F.3d 736, 740 (7th Cir. 2013). In Meekin's case, although the crime guns and the above analysis would be enough, this enhancement should additionally apply because Meekin transferred at least one firearm with reason to believe that the firearm would be possessed in connection with the felony offense of possessing an unregistered NFA firearm.

The essence of §2K2.1(b)(6)(B) in part is whether there is sufficient evidence to establish a defendant's reason to believe that the transferred gun or guns would be used in future felonious activity. *Jemison*, 237 F.3d at 918. Just like the other enhancement, the government bears the burden of proof by a preponderance of the evidence. *United States v. Wagner*, 467 F.3d 1085, 1089 (7th Cir. 2006). In *Jemison*, it was enough that the defendant just knew the guns were going to gang members, who are well known to be involved in criminal violence. *Jemison*, 237 F.3d at 918. "[W]e believe it would be 'naïve' for either the trial court or this court to conclude that [the defendant] never had any reason to believe that the firearms he supplied to the Gangster Disciples would be used in the commission of future felonies." *Jemison*, 237

F.3d at 918.  Similarly in *Gilmore*, a defendant's "general anticipation" of his guns ending up in the hands of gang members was sufficient, even though the defendant did not necessarily know the specific future criminal activity. *Gilmore*, 60 F.3d at 393-94.

Similar to the trafficking enhancement, there are a number of other factors that have been recognized as demonstrating a defendant's reason to believe a transferred firearm will be involved in a future felony.  For example, the Seventh Circuit has noted that the presence of a silencer and obliterated serial number contributed to showing knowledge of potential future felonious conduct.  *United States v. Messino*, 55 F.3d 1241, 1255-56 (7th Cir. 1995). Having personal contact with the buyer as the actual seller would be an obvious and important factor because the defendant then would know the circumstances and context of the sale. *United States v. Askew*, 193 F.3d 1181, 1184-85 (11th Cir. 1999).  Other factors could include the sale of illegal and unregistered NFA firearms, payment in cash, sales price being higher than market value, clandestine or covert behavior associated with the sale, engagement in an illegal firearms business, sales of numerous firearms, the nature of the weapon as an assault rifle, recovery of sold firearms in crimes, and removal of serial numbers.  *United States v. Tavares*, 427 F.3d 122, 125-26 (7th Cir. 2005);  *Wagner*, 467 F.3d at 1089; *United States v. Rogers*, 46 F.3d

31, 32-33 (7th Cir. 1995); *United States v. Leach*, 1999 WL 491855 at *1 (2d Cir. 1999) (unpublished opinion).

The concept of "another felony offense" extends to a prohibited possession offense by the buyer or transferee of the firearm. *Juarez*, 626 F.3d at 254-55; *United States v. Jones*, 528 Fed.Appx. 627, 632 (7th Cir. 2013) (following the Fifth Circuit's decision in *Juarez*). As emphasized above in italics, the definition of "another felony offense" means any federal or state offense, "other than *the* explosive or firearms possession or trafficking offense." U.S.S.G. §2K2.1, comment. (n. 14(C)) (2021) (emphasis added). Interpreting this commentary, the only offense excluded from consideration is the possession or trafficking offense that serves as the basis for the defendant's conviction. *Juarez*, 626 F.3d at 255; *Jones*, 528 Fed.Appx. at 632. "[L]ike the Fifth Circuit we conclude that the addition [of the word "the"] was meant to end the categorical exclusion of firearms and explosives offenses from the definition of 'another felony offense.'" *Jones*, 528 Fed.Appx. at 632.

If the Court does not believe the trafficking enhancement to apply, the evidence summarized above regarding the crime guns and the undercover firearms purchases would also support an enhancement pursuant to §2K2.1(b)(6)(B). The FFL's warning, the homicide detective's inquiry, and Meekin's statements and clandestine activity all demonstrate his reason to believe that his customers were committing felony crimes with the firearms

17

sold by him. The government however presents additional argument regarding Meekin's transfer of unregistered NFA firearms as separate conduct justifying this enhancement in addition to the trafficking enhancement, for a total increase of 8 levels.

Meekin exhibited significant covert and clandestine behavior when it came to the most dangerous of his supplied firearms, the machineguns, silencers, and other NFA firearms on his email list. Meekin engineered the dead drop procedure with secret money transfers and merchandise pickups through coordinates, and he utilized an anonymous email account, rotated every 30 days, and a TOR Internet browser for additional anonymity. He admitted to both undercovers that multiple friends had obtained firearms from the email list, which contained a laundry list of NFA firearms, and he even told the UC that he had shot these weapons. He further told the UC about how he had made a lot of "shady shit." When talking about the NFA registration requirements, Meekin was dismissive, saying it was a bunch of "bullshit" which no one does, and Meekin's general attitude was that anyone should be able to own any desired firearm, regardless of the law.

Based upon the undercover recordings, Meekin exhibited significant knowledge of converting a lower receiver to fire fully automatic as a machinegun. Meekin sold full-auto parts kits, but he did not list or advertise them on his parts website. Meekin described his unusual procedure of selling

his "ghost gunner" machine to a customer for a dollar so that the customer could mill his own receiver or machinegun with Meekin's expensive equipment. Meekin was so familiar with where to drill the hole for full-auto conversion that he did not need to use a jig to guide him. In Meekin's shop, the UC TFO observed a rifle with a silencer, which Meekin later hid from his view, and Meekin discussed shooting coyotes and foxes with a different silencer in order to keep the noise down for his neighbors. Meekin also admitted acquiring a machinegun and a sawed-off shotgun from the son of a deceased officer, with none of these NFA firearms or silencers found during the later searches. Meekin took the UC's money and was ready to make a highly illegal ghost machinegun with a suppressor, at least until Meekin conducted his Internet search and became worried about being caught.

All of these factors support Meekin's statements that he was making NFA firearms and providing them to others via the dead drop procedure. Based upon the evidence above, Meekin had reason to believe that his customers would not be registering their silencers, and any post-1986 machinegun could not be legally registered. These possession felonies by others are separate from Meekin's charges of conviction. These NFA offenses would therefore qualify as another felony offense and justify the second enhancement.

WHEREFORE, the United States of America requests that the Court impose both of the above enhancements.

>
> Respectfully submitted,
>
> CLIFFORD D. JOHNSON
> UNITED STATES ATTORNEY
>
> By: _____
> Anthony W. Geller
> Assistant United States Attorney
> E. Ross Adair Federal Bldg.
> & U.S. Courthouse
> 1300 S. Harrison Street, Room 3128
> Fort Wayne, IN 46802-3489
> Telephone: (260) 422-2595
> Facsimile: (260) 426-1616
> E-mail: anthony.geller@usdoj.gov