UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cause No. 1:19-CR-35-HAB |
| ) | |
| ADAM T. MEEKIN ) | |

**OPINION AND ORDER**

Defendant Adam T. Meekin ("Meekin") is full of it. At least that's Meekin's defense to the Government's assertion that he should be assessed eight more levels for trafficking in firearms. Despite making a laundry list of statements in which Meekin painted himself as an expert in the sale and manufacture of banned firearms, he now asserts that those statements were unconfirmed "hyperbole." The issue before the Court is whether those statements, coupled with Meekin's efforts to stay under law enforcement's radar, support the Government's claimed enhancements by a preponderance of the evidence.

**I.  Factual Background**

By every measure, Meekin and his family members were prolific firearms builders. In total, the family bought 122 lower receivers on Meekin's behalf. Meekin, in turn, would turn these lower receivers into functioning firearms, advertising them for sale via social media. These advertisements were what brought Meekin to the attention of ATF. Subsequent database checks turned up eleven separate crime guns that were traced to lower receivers bought by a Meekin family member.

To further their investigation, ATF employed two undercover agents to perform purchases from Meekin. The first, UC1, bought a fully assembled rifle and parts to convert the rifle into a machine gun in June 2018. UC1 gave almost no details about himself to Meekin. Nor did UC1

suggest that he was purchasing the firearm for any nefarious purpose, instead telling Meekin that he "wanted to hide it or bury it, just to have it."

It was during his dealings with UC1 that Meekin made many statements on which the Government now relies. Meekin told UC1 that he had been in business for two or three years, making about $5,000 per month. Meekin advised that there was "nothing [he] can't build." Meekin further told UC1 that he would temporarily "sell" his "ghost gunner machine," used to create completed lower receivers without serial numbers, to customers for one dollar.

It was during a second meeting with Meekin that UC1 asked to purchase a fully automatic machine gun. Meekin explained that UC1 would have to purchase the firearm through an anonymous email address that Meekin would provide after the meeting. Although Meekin did not show UC1 any completed machine guns, he explained the process for converting a firearm into a fully automatic machine gun, stating that he had performed the process so many times that he could drill the necessary hole without using a jig. Meekin also explained the process for removing a serial number from a firearm, with a die grinder being his preferred method.

Two weeks after the second meeting, Meekin sent a message to UC1. Meekin explained why he was concerned about firearms potentially being traced to him by serial numbers: "[It's a] liability thing, if I purchase it, it's in my name. If you go out and do something with it, it comes back to me, and then I have to deal with the mess. So I always tell clients bring your own lower if you want it assembled."

In November 2018, Meekin provided UC1 with the anonymous email address for purchasing banned firearms and explained a clandestine dead drop procedure for obtaining such a firearm. Sure enough, UC1 received a price sheet from the email address with an extensive list of

banned firearms. UC1 placed an order for a machine gun and a suppressor at a price of $3,000. UC1 received instructions to meet at a Glenbrook Mall bathroom for a secret money exchange.

UC1 appeared at the bathroom on the agreed upon date. The operator of the email address was already there, hiding in a stall. UC1 determined that the individual in the stall was the operator of the email address because, when UC1 sent a message to the anonymous email address, UC1 heard a phone chime coming from the stall. The exchange of money was done via a gloved hand reaching out from under the stall door. Subsequent surveillance by ATF observed Meekin emerging from Glenbrook Mall with the envelope full of cash. This was confirmation for the ATF that Meekin was the operator of the email address.

Two months later, UC1 met with Meekin to check on his purchase. Meekin told UC1 that he would "shoot them an email," explaining that he used a TOR internet browser to conceal his internet identity. Meekin confirmed to UC1 that Meekin had multiple friends that had successfully bought firearms using the email address. During this conversation, Meekin advised that he had sold nearly $50,000 in merchandise over the holiday season. Meekin further stated that everyone had the right to own whatever firearm they wanted, commenting that he had "made some shady shit" over the years.

Still having not received his machine gun or silencer, UC1 again visited Meekin in April 2019. Meekin stated that he had looked up UC1's phone number and it did not return to UC1's undercover name. Because of this, UC1 would not be receiving his merchandise, but Meekin was willing to sell him all the parts with an instruction sheet for making the machine gun and silencer. During this meeting, Meekin told UC1 that he had been selling a lot of AK-47 variants, with customers willing to pay more than they could purchase the firearms from a legitimate dealer.

The second undercover agent, UC2, made two firearms purchases from Meekin in August 2018. UC2 brought his own lower receiver, at Meekin's request, for the first purchase. As Meekin was assembling the firearm, UC2 observed several lower receivers and a completed AR rifle with a silencer. Meekin advised that a customer had dropped the rifle off to have work done. When UC2 tried to get a closer look at the rifle, Meekin grabbed it and placed it out of view. Still, UC2 observed two other silencers in a drawer. As Meekin continued to assemble the firearm, he discussed the possibility of engraving a fake serial number of a gun which, Meekin advised, was less conspicuous than no serial number. UC2 left that meeting with an assembled firearm, but Meekin had accidentally assembled the firearm using a different lower receiver than the one provided by UC2.

UC2 returned to Meekin's shop a week later. Meekin wanted the firearm back from the prior deal, stating that he assembled the firearm with the wrong lower receiver and the one that was used could be traced to Meekin. Just as he had with UC1, Meekin discussed the anonymous email procedure with UC2, analogizing the process to that of a drug dealer.

On the back of these purchases, ATF executed search warrants on Meekin's home and shop in April 2019. Agents found an unregistered and unserialized silencer and an unregistered bump stock. What agents did not find was any sales paperwork or business ledgers for Meekin's stated firearms transactions. This was despite Meekin's Facebook records showing multiple PayPal accounts, a steady rotation of firearms for sale, and advertised discounts for bulk firearms purchases.

The same day as the search warrants were executed, ATF also interviewed Thomas Dempsey, the federal firearms license holder that sold Meekin's family the lower receivers. Dempsey confirmed selling lower receivers to Meekin, with Meekin never completing paperwork

and always paying in cash. Dempsey also told agents that, following several ATF firearms traces related to the lower receivers sold to Meekin, Dempsey told Meekin he was selling to the "wrong people." Meekin confirmed being aware of some of these traces during his interview with ATF.

As it turns out, much of what Meekin told the undercover agents could not be confirmed. Consider Meekin's statement to UC1 about one of Meekin's weapons being used in a homicide. Meekin told UC1 that he was asked to answer questions about the homicide by a detective, but Meekin refused. Meekin then said that his attorney "somehow got the police officer suspended for violating his rights." None of this story is supported by evidence in the record and, as Meekin points out, the story is incredible on its face.

There are many other examples of Meekin either exaggerating or outright lying to the undercover agents. Meekin told UC1 he was an IT person for a Department of Defense contractor in Indianapolis; in fact, Meekin had never worked outside of northeast Indiana. Meekin told UC1 that he was writing a "how to" book on running an illegal firearms business; no evidence of this book was found during the search of Meekin's property. Meekin told UC1 that he used a TOR browser to communicate with the operators of the anonymous email account; no evidence of Meekin using such a browser was ever uncovered. ATF was also unable to uncover any evidence to support Meekin's statement that he was selling firearms above market price.

**II.     Procedural Background**

Meekin was charged with, and pleaded guilty to, engaging in the business of dealing and manufacturing firearms, in violation of 18 U.S.C. § 922(a)(1)(A), and to the unlawful possession of an unregistered firearm, in violation of 26 U.S.C. § 5841(d) and 5861(d). The parties agreed that the offense involved between 100 and 199 firearms. Probation issued a draft presentence investigation report calculating Meekin's total offense level at 23. The Government objected to

the report, asserting that Meekin should be assessed a four-level enhancement for trafficking in firearms under U.S.S.G. § 2K2.1(b)(5). In its brief in support of its objection, the Government also asserted that Meekin should be assessed another four-level enhancement for transferring a firearm with knowledge, intent, or reason to believe that the firearm would be used or possessed in connection with another felony offense under U.S.S.G. § 2K2.1(b)(6)(B).

### III.   Legal Discussion

#### A.   *U.S.S.G. § 2K2.1(b)(5)*

Section 2K2.1(b)(5) of the United States Sentencing Guidelines calls for a four-level enhancement to a defendant's base offense level "[i]f the defendant engaged in the trafficking of firearms." Relevant here, the commentary requires two elements for the enhancement to apply: (1) Meekin must have transferred two or more firearms; and (2) Meekin must have known, or had reason to believe, that the individuals receiving the firearms "intended to use or dispose of the firearm unlawfully." U.S.S.G. § 2K2.1, cmt. 13(A). The Government must establish the applicability of the enhancement by a preponderance of the evidence. *United States v. Moody*, 915 F.3d 425, 429 (7th Cir. 2019).

The parties agree the Government must show more than off-the-books firearms transactions to show that the enhancement applies. *See*, *e.g.*, *id.* at 430–31. That said, the Court has "great leeway to make commonsense inferences" about Meekin's knowledge. *Id.* at 430. Among the factors considered by courts in applying the enhancement are: the clandestine nature of the sales and prices above retail, *United States v. Juarez*, 626 F.3d 246, 252 (5th Cir. 2010); sales to known drug dealers, *United States v. Freeman*, 640 F.3d 180, 189 (6th Cir. 2011); and sales of firearms that criminals "actively seek," *United States v. Garcia*, 635 F.3d 472, 479 (10th Cir. 2011).

The Government points to several pieces of evidence that it claims support the application of the enhancement. It notes the large number of firearms sold by Meekin that were later associated with crimes, Meekin's efforts to distance himself from the firearms, the clandestine dead drop procedure used with UC1, Meekin's statements to the UCs about his business, and Dempsey's statement to Meekin that Meekin was selling to the "wrong people." (ECF No. 83 at 12–14). Meekin acknowledges most of this evidence but asserts generally that Meekin's statements about his firearm selling prowess should not be accepted. (ECF No. 89 at 6–8).

The Court accepts Meekin's argument that much of what he told the UCs is uncorroborated and incredible, but not all the evidence comes from Meekin's mouth. The clandestine nature of the ordering process and money transfer used by UC1 is strong evidence that Meekin expected that his purchaser would use the firearm for illegal purposes. *See Juarez*, 626 F.3d at 252. Meekin's attempts to distance himself from the firearms, whether by using straw purchasing family members or having customers bring their own serialized lower receiver, is also probative.

Meekin never explains these pieces of evidence. He does not explain why, if he was unconcerned about the ultimate uses for the firearms, he would take such lengths to distance himself from the firearms. He does not explain why he would go through such extensive efforts to hide his identity while selling the firearms. And the Court can think of no explanation on its own, other than that Meekin had reason to believe, if not outright knowledge, that the firearms would be used in an illegal manner. The Court finds that the enhancement under U.S.S.G. § 2K2.1(b)(5) is appropriate.

**B.**     ***U.S.S.G. § 2K2.1(b)(6)(B)***

Section 2K2.1(b)(6)(B) of the United States Sentencing Guidelines calls for a four-level enhancement to a defendant's base offense level if, relevant here, he "possessed or transferred any

firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." Because the Government asks the Court to apply this enhancement in addition to (b)(5)'s trafficking enhancement, reference to comment note 13(D) is required. That comment, discussing the interaction between the trafficking enhancement and other guideline sections, states: "[i]f the defendant used or transferred one of such firearms in connection with another felony offense (i.e., an offense other than a firearms possession or trafficking offense) an enhancement under subsection (b)(6)(B) also would apply." U.S.S.G. § 2K2.1, cmt. 14(D). The Seventh Circuit has interpreted the parenthetical language as "expressly prohibit[ing]" the application of both enhancements where they are based "on the same conduct." *United States v. Johns*, 732 F.3d 736, 740 (7th Cir. 2013).

The Government seemingly understands that the conduct that supports the trafficking enhancement (i.e., the clandestine conduct and Meekin's attempts to distance himself from completed firearms) cannot also support (b)(6)(B)'s another felony enhancement. (ECF No. 83 at 17) ("If the Court does not believe the trafficking enhancement to apply…"). So, as a fallback, the Government argues that the possession by Meekin's customers of firearms prohibited by the National Firearms Act ("NFA") could constitute the other felony. (*Id*. at 19). The Court cannot agree.

The Court accepts, in part, the Government's argument that "there is no prohibition in applying both the trafficking enhancement with the (b)(6)(B) enhancement] so long as the other felony offence is something other than the defendant's firearms possession and trafficking." (*Id*. at 15). There is no question that both enhancements can be applied; the Government's authorities state as much. What those authorities do not show, at least in the Court's mind, is the application of the enhancement where the other felony is intertwined with the defendant's crime of conviction.

8

The Government's first two authorities, *United States v. Shelton*, 905 F.3d 1026 (7th Cir. 2018), and *United States v. Rodriguez*, 884 F.3d 679 (7th Cir. 2018), are easily distinguished. In *Shelton*, the other felony was the robbery of a cargo train (905 F.3d at 1034) and in *Rodriguez* the other felony was using the firearms to shoot rival gang members (884 F.3d at 679). The sale of firearms to known gang members distinguishes two other authorities relied on by the Government, *United States v. Jemison*, 237 F.3d 911, 918 (7th Cir. 2001), and *United States v. Gilmore*, 60 F.3d 392, 393 (7th Cir. 1995). In each of those cases, there were tangible, temporally distinct felonies that occurred *and could be anticipated* by the defendant. Comment 13(D)'s prohibition is inapplicable in those cases.

This case strikes the Court as much more like another authority cited by the Government, *Johns*. There, the district court applied both enhancements based on the defendant's act of selling firearms to an individual that the defendant knew was reselling the firearms. 732 F.3d at 740. The Seventh Circuit concluded that this was "impermissible because Application Note 13(D) to § 2K2.1 expressly forbids it." *Id*. The other felony in *Johns*, the illegal resale of firearms, strikes the Court as far more distinct than the felony argued by the Government here, simple possession. If *Johns* constituted impermissible double counting, the Court cannot see how applying both enhancements here would be any less so.

It is true that there is probably a factual basis for applying the (b)(6)(B) enhancement here. But that basis is the same basis that supports the (b)(5) enhancement. With no suitable other felony having been identified by the Government, the Court will not apply both here. The Government's objection based on U.S.S.G. § 2K2.1(b)(6)(B) is overruled.

**IV.     Conclusion**

For these reasons, the Government's objection to the PSR based on U.S.S.G. § 2K2.1(b)(5) is SUSTAINED. The Government's objection to the PSR based on U.S.S.G. § 2K2.1(b)(6)(B) is OVERRULED. The probation officer is DIRECTED to prepare an amended final presentence investigation report consistent with this Opinion and Order.

SO ORDERED on March 27, 2023.

           s/ Holly A. Brady  
           JUDGE HOLLY A. BRADY  
           UNITED STATES DISTRICT COURT